**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRACI BARDELLI, *et al.*,** | : | |
| | : | |
| **Plaintiffs** | : | **CIVIL ACTION NO. 3:14-0691** |
| | : | |
| **v.** | : | |
| | : | **(JUDGE MANNION)** |
| **ALLIED SERVICES INSTITUTE** | | |
| **OF REHABILITATION MEDICINE,** | : | |
| | : | |
| **Defendant** | : | |

## M E M O R A N D U M

Plaintiffs Traci and Joseph Bardelli, individually and on behalf of their minor daughter M.B., filed this action asserting claims under the Americans with Disabilities Act and the Rehabilitation Act as well as state law claims regarding their attempt to have M.B. attend the dePaul School with her service dog Buddy, trained to identify seizures in M.B. and to alert others when she has a seizure. M.B., a 12-year old student with severe epilepsy who was previously enrolled at the dePaul School, was prevented from attending the school with Buddy. After M.B. was barred from attending the school with Buddy and she was forced to miss school, her parents enrolled her in the Dunmore School District where they lived. Defendant Allied Services Institute of Rehabilitation Medicine ("Allied")  then offered several accommodations to M.B., including to allow Buddy in the school wearing a dander control t-shirt, and M.B. returned to the dePaul School for a short period of time from

January 2, 2014 until January 16, 2014. Plaintiffs then removed M.B. from the school after Buddy failed to perform properly while he was wearing the t-shirt.

Allied filed a motion for summary judgment, (Doc. 43), arguing that plaintiffs failed to dispute its evidence that the accommodations offered to M.B. during her attendance at the dePaul School were reasonable. For the following reasons, the motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    MATERIAL FACTS[1]

M.B. is 12 years old and is the child of plaintiffs. M.B. has Chiari Malformation, Hydrocephalus, Complex Partial Epilepsy Intractable, Dyslexia and suffers from three types of seizures. In particular, M.B. has absent, complex partial, and full tonic-clonic grand mal seizures. When M.B. has a simple partial seizure she is still conscious but it may progress to a complex partial seizure where she loses consciousness. A complex partial seizure can then progress to a secondarily generalized seizure where M.B.'s body convulses and shakes.

M.B. enrolled in the dePaul School in November of 2011 at age eight without a service dog but was waiting to get a new service dog after her previous service dog became ill. The dePaul School is a division of Allied. The

---

[1] The material facts are derived from Allied's statement of facts, (Doc. 45), the plaintiffs' response, (Doc. 47), and the exhibits attached to both documents as well as to the briefs.

mission of the dePaul School is to teach students with dyslexia and other specific learning differences how to learn, and it is accredited by the Pennsylvania Department of Education. Plaintiffs discussed with the principal of the dePaul School, Suzanne Rickard, why M.B. would need to attend school with her new service dog. In February of 2012, M.B. received Buddy, a certified service dog specially trained to identify seizure activity in M.B., to alert others of seizures, and to stay and provide comfort to M.B. during a seizure. M.B. and Buddy trained together.

M.B. attended the dePaul School during the 2011-2012 school year without Buddy. However, plaintiffs advised Rickard that after M.B. received her new service dog, the dog would be accompanying M.B. to school. Rickard refused to allow Buddy to be at the school with M.B. stating that Buddy would distract other students. During this school year, M.B. missed school when she experienced cluster seizures since she was not allowed to have Buddy at the school.

Similarly, during the 2012-2013 school year, M.B. attended the dePaul School without Buddy. Before this school year started, plaintiffs again asked Rickard to allow M.B. to attend school with Buddy and Rickard again refused repeating that Buddy would be a distraction. Nonetheless, plaintiffs decided to send M.B. to the school without Buddy since "[i]t was important that [M.B.] be well educated to the best of our ability." The dePaul School provided some accommodations to M.B., namely, by agreeing to administer suppository medication if needed and by allowing M.B. to lay down after she had a

3

seizure.

During the 2013-2014 school year, M.B. attended the dePaul School without Buddy after plaintiffs' request to allow M.B. to attend school with Buddy was again denied by Allied. The dePaul School provided some accommodations to M.B. by assisting her with her feeding tube if required, by agreeing to administer suppository medication if needed and by allowing M.B. to lay down after she had a seizure if she was tired. The school also did not require M.B. to take gym class and allowed her to take another class in its place.

At the October 25, 2013 parent/teacher conference, M.B.'s mother asked Rickard to allow Buddy to go to school with M.B. due to the increased seizure activity M.B. was experiencing after she was weaned off her prescribed ketogenic diet and due to the fear and anxiety M.B. was experiencing over the increased seizures. Rickard did not doubt M.B.'s mother that it was medically necessary to allow Buddy to attend school with M.B. and agreed to "check things out to see what, if anything, we can do." Rickard told M.B.'s mother she would get back to her with a response. As research for her response, Rickard reviewed the emergency contact cards of the students at the school and discovered that one student was allergic to dogs.

Buddy attended a Holloween Bingo at the school with M.B. on October 26, 2013. Rickard told M.B.'s mother that she looked into whether Buddy could attend the school and said she discovered that a student at the school

4

(M.H.) was "very, very allergic to dogs." This fact was indicated on M.H.'s student emergency card. Rickard told M.B's mother to keep Buddy far away from M.H. before going into the room for the bingo. Nonetheless, M.H. was unable to stay at the bingo because he had an allergic reaction to Buddy. Buddy was also allowed to attend other functions at the school as well.

Subsequently, M.H.'s parents wanted M.B. to attend the school with Buddy and they also wanted M.H. to be able to visit his friends who had dogs. Thus, they took steps to address M.H.'s allergies, including having him get allergy shots.

M.B.'s mother brought M.B. to school with Buddy on October 28 and October 29, 2013. On both days, Rickard told M.B.'s mother that M.B. could not have Buddy at school, and her mother then left the school with M.B. and Buddy. Nobody at the school told M.B. that she could not stay at school by herself on either day. In fact, Rickard invited M.B. to stay at school without Buddy.

M.B. did not attend the dePaul School at any time between October 29, 2013 and January 2, 2014. The dePaul School sent home the work that the students were doing during the school day, but M.B. was unable to complete this work without teacher instruction. In order to avoid having M.B. deemed as truant, her mother enrolled her at Dunmore Elementary School on November 18, 2013. However, M.B. was still enrolled at the dePaul School and her mother advised Rickard that she intended to have M.B. return to the school.

On November 20, 2013, M.B.'s mother met with Rickard and Rickard asked her to remove M.B.'s possessions from the school. M.B.'s mother refused and told Rickard that she intended for M.B. to return to the school. She also gave Rickard a note from M.B.'s pediatrician, Dr. Martha Sauter, stating that it was medically necessary for Buddy to be with M.B. "24 hours/7 days a week." This letter was the first written documentation plaintiffs provided to the school indicating that it was medically necessary for M.B. to use her service dog at school. Additionally, plaintiffs completed Student Emergency Cards for M.B. for the 2011-2012, 2012-2013 and 2013-2014 school years and these cards did not indicate that M.B.'s epilepsy required her to have a service dog at school. Plaintiffs however had verbalized this fact to the school in the past on several occasions.

On November 25, 2013, plaintiffs' counsel wrote a letter to Rickard demanding that M.B. be allowed to attend the school with Buddy. On November 27, 2013, Allied's counsel responded to plaintiffs' letter stating that M.B. could return to the school at any time but the school could not yet accommodate her to attend the school with Buddy. After receiving Dr. Sauter's and plaintiffs' counsel's letters, Rickard began to discuss with staff at the school how they could accommodate both M.B. and M.H.

The dePaul School changed the home room of M.H. and his schedule so that he would not be in the same room as Buddy. The school also arranged to have housekeeping vacuum and dust the rooms every night in order to reduce animal dander. The dePaul School offered additional

6

accommodations to M.B., including rearranging her schedule after her brain surgery, allowing her to pick 2 or 3 buddies to stay in and play cards with her when she could not go outside for recess and excusing M.B. from the punishment of detention or in-school suspension due to absences related to health issues.

Pursuant to Allied's suggestion, plaintiffs' counsel wrote a letter to the dePaul School on December 5, 2013 with proposed accommodations for M.B. to return to the school with Buddy on December 9, 2013. (Doc. 48-1). One of the proposals was that "Buddy will wear a shirt" in the school to reduce the spread of dander and allergens. Counsel for Allied responded in a December 6, 2013 letter stating that the dePaul School agreed to allow M.B. to return to the school on January 2, 2014 with Buddy under the following four conditions:

> a. Buddy will wear a shirt at all times that will control his dander. Parents will purchase the shirt and provide proof of the type of shirt to Allied Services and the dePaul School prior to January 2, 2014;
> b. Buddy will be restrained on a leash at all times while walking in the hallways of the dePaul School;
> c. Parents will arrange for the necessary individuals within the administration of the dePaul School to be trained with Buddy prior to January 2, 2014; and
> d. Parents will arrange for a presentation to the students, teachers and staff at the dePaul School regarding Buddy. This presentation will take place on January 2, 2014.

> Allied did not accept the other accommodations plaintiffs had proposed.

> M.B. returned to the dePaul School with Buddy on January 2, 2014.[2] At

_____

[2]M.B. remained out of school from October 25, 2013 through January 2, 2014.

first, Buddy wore the dander control t-shirt. Eventually, plaintiffs sent Buddy to school without the shirt since he was hot and failed to alert when M.B. had a seizure which caused her anxiety. Plaintiffs contacted New Hope Assistance Dogs ("New Hope") about the situation and one of the trainers, Ben Castro, responded in a letter on January 18, 2014 stating that "[o]ur dogs are not trained with any type of shirt, placing our dogs in shirts would have an effect that we cannot predict. We encourage our clients to keep with our training tactics and not to change any at any time." (Doc. 47-21). Castro did not suggest re-training Buddy. Nor did plaintiffs ask him if re-training Buddy to wear a t-shirt was possible.

After M.B. returned to the dePaul School on January 2, 2014, M.H.'s teachers indicated that he appeared more tired in class since the medication he was taking to control his dog allergy, and that there were a few days when he suffered from severe nose bleeds. One day, M.H. had to lay down in Rickard's office for a short time. M.H.'s parents however did not report that he was ill when M.B. attended the school with Buddy. Nor is there any medical evidence that M.H.'s allergy medication caused him to be tired and to have nose bleeds.

The dePaul School advised plaintiffs that Buddy could not stay at the school unless he wore his dander control t-shirt. When Buddy appeared at the school without the shirt, the school put an ordinary t-shirt on him. However, Buddy failed to consistently perform as he was trained to and M.B. continued to have seizures at the school. On January 16, 2014, plaintiffs removed M.B.

from the school after she was found asleep on the floor of Rickard's office following a seizure. This was the last day M.B. attended the dePaul School. Plaintiffs aver that Allied never suggested that Buddy be re-trained wearing a t-shirt and never offered to pay for any re-training. However, plaintiffs did not ask New Hope if Buddy could be re-trained wearing a t-shirt.

Prior to January 16, 2014, plaintiffs never provided the dePaul School with a note from M.B.'s neurologist, Dr. Bergqvist, indicating that it was medically necessary for M.B.'s seizure dog to accompany her at all times. However, as mentioned, in November 2013 plaintiffs had provided Rickard with the letter from Dr. Sauter stating that it was medically necessary for Buddy to be with M.B. at all times, and plaintiffs had advised the school many times that it was medically necessary for Buddy to attend school with M.B.

Amy Bennett, founder and head trainer of New Hope, was identified in plaintiffs' Disclosure of Expert Testimony pursuant to Fed.R.Civ.P. 26(a)(2) as one of their witnesses expected to present testimony under FRE 702, 703 and 705.[3] At her April 30, 2015 deposition, seemingly to be used at trial, plaintiffs offered Bennett as "an expert in the protocol and procedure for training service dogs, the appropriate pairing of service dogs and the recipient disabled person, and the bond between the service dog and its recipient." (Doc. 45-8, at 5). Allied did not object to Bennett's qualifications. Bennett

---

[3]The admissibility of expert testimony is governed by FRE 702, which requires an expert witness to have "specialized knowledge" regarding the area of testimony.

9

testified that she was a certified assistance dog trainer and the principal trainer for Buddy. Buddy was certified for the Public Access Test. Buddy was taught to get help if the child sensed a seizure was coming and to comfort the child during a seizure. M.B. and Buddy trained together and, Bennett testified that in her expert opinion they were well matched and had an excellent bond.

Bennett also stated that in her opinion, "Buddy excels at his job. He is quiet.... Knows his job, does it well. Follows [M.B.] everywhere. Listens to her commands. Stays out of the way. Is not excessively seeking attention from others...." Although the dogs at New Hope, including Buddy, are not trained to work while wearing a t-shirt, Bennett stated that "our dogs are taught to be very adaptable, they can learn to work in any situation." [Some dogs are trained to] wear[] a backpack. Some dogs wear identification vests that cover a larger part of the body. Some wear a body harness to offer stability for an individual who is walking." Additionally, Bennett stated that in her experience a dog wearing a t-shirt reduces his allergens "[b]y containing the dander and reducing exposure to the coat that has saliva because the dog licks himself. The dander and the saliva are more of an allergy irritant than the fur." (Id. at 9).

As such, there is no dispute that Bennett admitted that "a dog can be trained to wear a t-shirt" and that after Buddy left New Hope with M.B. it would have been possible to train him to wear a dander control t-shirt in order to accompany her to school. (Id. at 10-11). Bennett stated that she was not contacted by anyone on behalf of plaintiffs from December 1, 2013 through

January 2, 2014 requesting that Buddy be trained to wear a dander control t-shirt with M.B. at school. Also, before plaintiffs removed M.B. from the dePaul School they did not contact Bennett to ask if Buddy could have such training. Further, Bennett stated that if she was contacted, she was capable of providing such training to Buddy and that he would have been able to adapt to it within a week.

In her Declaration, (Doc. 47-11), M.B.'s mother stated that "neither [] Bennett nor anyone else at New Hope ever told me that Buddy could be retrained to wear a t-shirt." She also stated that "Allied never suggested that Buddy be retrained wearing a t-shirt and never offered to pay for retraining."

Plaintiffs also conducted the expert deposition of Dr. Christina Bergqvist on May 1, 2015, who is a board certified child necrologist and epileptologist, and an expert in pediatric neurology, intractable epilepsy and ketogenic diet (a special diet to reduce seizures). Dr. Bergqvist has been M.B.'s neurologist since February 2009. M.B. was placed on a ketogenic diet but the doctor decided to wean her off of it due to complications she was experiencing. Dr. Bergqvist prepared a note on December 12, 2013 indicating that it was medically necessary for M.B. to attend school with her service dog and accompany her at all times. Dr. Bergqvist stated that the service dog makes M.B. safer and alerts others when she has a seizure. However, Dr. Bergqvist never delivered her note of December 12, 2013 to the dePaul School. However, Allied never requested plaintiffs to produce documentation showing that Buddy was medically necessary.

11

On May 18, 2015, Allied conducted an expert deposition of Ann Cook, a licensed social worker and M.B.'s therapist since the fall of 2013. Cook opined that M.B. suffers from moderate to severe social anxiety and depression, and that when M.B. was not allowed to bring Buddy to school her conditions exacerbated. Although Cook could not opine whether M.B.'s suffering from social anxiety or depression would be alleviated if Buddy was allowed in the dePaul School with her, Cook did state that M.B.'s depressive symptoms and low self-esteem intensified after she was barred from having Buddy at the school and that this was when M.B.'s depression was the most severe. Cook also stated that M.B. did not want to go to school without Buddy and it caused her to feel she was not safe there. Cook concluded that Buddy was M.B.'s "one sense of security" and he "makes her feel safe."

## II.    PROCEDURAL BACKGROUND

The plaintiffs brought this suit on April 9, 2014, asserting federal claims under Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. §794, and under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131, *et seq*. The plaintiffs also raised state law claims for breach of contract, negligence and intentional infliction of emotional distress ("IIED"). (Doc. 1). On June 13, 2014, Allied filed a motion to dismiss the plaintiffs' complaint with respect to their federal claims under Fed.R.Civ. 12(b)(1) and with respect to their adult state law tort claims under Fed.R.Civ.P. 12(b)(6). (Doc. 8). On March 6, 2015, the court denied Allied's motion with respect to all of the

plaintiffs' claims. (Doc. 20, Doc. 21). *See* 2015 WL 999115.

On March 27, 2015, Allied filed an answer to plaintiffs' complaint with affirmative defenses and a cross-claim. (Doc. 22).

On December 11, 2015, plaintiffs filed a motion for leave to file an amended complaint, (Doc. 36), and the court granted it, (Doc. 39). Plaintiffs filed their amended complaint on January 8, 2016, (Doc. 40), again raising federal claims under §504 of the RA and the ADA as well as state law claims for breach of contract, negligence, IIED and a violation under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §955(i)(1). Allied filed its answer to the amended complaint with affirmative defenses on January 11, 2016. (Doc. 42).

On January 21, 2016, Allied filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56 with respect to all of plaintiffs' claims in their amended complaint. (Doc. 43). Allied simultaneously filed its brief in support, (Doc. 44), with an attached copy of an investigative report commissioned by Allied from Corey Anders of Robson Forensic, Inc., (Doc. 44-1). Allied also filed its statement of material facts with exhibits. (Doc. 45). On February 10, 2016, plaintiffs filed their brief in opposition, (Doc. 46), and their answer to Allied's statement of material facts with exhibits, (Doc. 47). Allied filed a reply brief on February 18, 2016. (Doc. 48).

This court's jurisdiction over the plaintiffs' federal claims is based on 28 U.S.C. §1331 and, the court's pendent jurisdiction over their state claims is based on 28 U.S.C. §1337.

13

## III.   STANDARD OF REVIEW

Allied's motion for summary judgment is brought pursuant to the provisions of Fed.R.Civ.P. 56. Allied argues that under Rule 56, the undisputed material facts demonstrate that plaintiffs were provided with reasonable accommodations and it is entitled to summary judgment with respect to plaintiffs' federal claims.

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D.Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; *see also* Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli

14

v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); *see also* Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). The nonmoving party "may not rest on the allegations set forth in its pleadings but must counter with evidence that demonstrates a genuine issue of fact." Big Apple BMW, 974 F.2d at 1363. However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## IV.    DISCUSSION

### A. __ADA and PHRA Claims, Counts II and VI__

Plaintiffs assert disability discrimination claims against Allied pursuant to the ADA and §955(i)(1) of the PHRA.[4] Plaintiffs' ADA and PHRA claims are based on the alleged failure of Allied to provide M.B. with reasonable accommodations to attend the dePaul School with Buddy. As relief in their ADA claim, plaintiffs seek "compensatory damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court." (Doc. 40, at 16). Plaintiffs do not specify in their ADA claim under which Title of the ADA they are proceeding. However, the court finds that plaintiffs' ADA claim falls under Title III since they allege, and Allied admits, that the school was a place of public accommodation. Plaintiffs also indicate in their brief in opposition, (Doc. 46, at 19), that their ADA claim is under Title III. (*See also* Doc. 47-24, declaration of plaintiffs' attorney).

Under Title III of the ADA, discrimination is prohibited "against the disabled in the full and equal enjoyment of public accommodations." Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 128, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005). As such, entities that provide public accommodations, in part, must provide auxiliary aids and services to disabled individuals. Id. (citations omitted). "[A] plaintiff alleging a Title III claim [must] show that: "(1)

---

[4]The "analysis of an ADA claim applies equally to a PHRA claim." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). Therefore, the court will consider both claims together.

he has a disability within the meaning of the ADA; (2) he was discriminated against by defendant on the basis of that disability; (3) he was thereby denied goods or services; and (4) the defendant owns, leases (or leases to), or operates a place of public accommodation." Hollinger v. Reading Health Sys., 2016 WL 3762987, *9 (E.D.Pa. July 14, 2016) (quoting Haas v. Wyoming Valley Health Care Sys., 465 F.Supp.2d 429, 433 (M.D.Pa. 2006))).

It is undisputed that M.B. had a disability within the meaning of the ADA. Discrimination under the ADA includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities...." 42 U.S.C. §12182(b)(2)(A)(ii).  Thus, it would be discriminatory for Allied to deny M.B. the opportunity to benefit from the educational services and to participate in the programs of the dePaul School based on her disability. 42 U.S.C. §12182(b)(1)(A)(i). Further, "the denial of reasonable accommodations [is] a denial of services based on [M.B.'s] disability in violation of Title III." Hollinger, 2016 WL 3762987, *10.

Initially, insofar as the plaintiffs only request monetary damages with respect to their claim under Title III of the ADA, such relief is improper. Shaika v. Gnaden Huetten Memorial Hosp., 2015 WL 4092390 (M.D.Pa. July 7, 2015). "Under Title III of the ADA, private plaintiffs may not obtain monetary

17

damages and therefore only prospective injunctive relief is available."
Anderson v. Macy's, Inc., 943 F.Supp.2d 531, 538 (W.D.Pa. 2013) (citation
omitted); Hollinger, 2016 WL 3762987, *10 (citations omitted). Despite the
fact that Allied did not raise the issue of standing in its summary judgment
motion and plaintiffs did not address it in their brief, the court can, in its
discretion, sua sponte address this issue since it is jurisdictional. Hollinger,
2016 WL 3762987, *10 (citation omitted); Pub. Interest Research Grp. of N.J.,
Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir. 1997) ("Standing
is a threshold jurisdictional requirement, derived from the 'case or controversy'
language of Article III of the Constitution.") (citation omitted).

The plaintiffs are permitted to request prospective injunctive relief with
respect to their Title III ADA claim, but they have not done so. As such,
plaintiffs' Title III ADA claim will be dismissed with prejudice. *See* Shaika,
supra. The court finds futility in allowing plaintiffs leave to file a second
amended complaint in order to request prospective injunctive relief with
respect to their ADA claim since they have failed to show that M.B. is likely to
suffer future injury from Allied's alleged illegal conduct. It is undisputed that
on January 16, 2014 plaintiffs withdrew M.B. from the dePaul School and this
was the last day M.B. attended the school. There is no evidence in the record
indicating that plaintiffs intend to ever return M.B. to the dePaul School. Nor
do plaintiffs contend that there is any likelihood of M.B. returning to the

dePaul School, i.e., the place of the alleged ADA violation.

In any event, M.B. has not attended the dePaul School in over two and one half years. Since prospective injunctive relief is plaintiffs' sole remedy under Title III of the ADA, as this court stated in Shaika, 2015 WL 4092390, *4, "courts look beyond the alleged past violation and consider the possibility of future violations." (citation omitted). "To establish standing in an action for injunctive relief, a plaintiff must show that he or she is likely to suffer future injury from the defendant's illegal conduct." Doe v. Nat'l Bd. of Med. Examiners, 210 Fed.Appx. 157, 159 (3d Cir. 2006) (citation omitted). "Past illegal conduct is insufficient to warrant injunctive relief unless it is accompanied by "continuing, present adverse effects." Id. at 159-60. Additionally, "[t]he imminency requirement is applicable in Title III [ADA] cases." Phillips v. St. Mary's Medical Center, 2013 WL 1124372, *3 (citing Doe, 199 F.3d at 153).

As noted, the analysis of an ADA claim applies equally to a PHRA claim. See Kelly v. Drexel Univ., 94 F.3d at 105 (the court should treat PHRA and ADA claims coextensively since they define disability substantially the same). As such, the same reasoning that applies to the plaintiffs' Title III ADA claim also applies to their claim under the PHRA, "thus allowing courts to dispose of both ADA and PHRA claims on the same grounds." Michalesko v. Freeland Boro., 18 F.Supp.3d 609, 626 (M.D.Pa. 2014) (quoting Bialko v. Quaker Oats

Co., 434 Fed.Appx. 139, 142 n. 5 (3d Cir. 2011)). Therefore, since the plaintiffs' ADA claim will be dismissed with prejudice for lack of standing, their PHRA claim will also be dismissed with prejudice. *See* Shaika, 2015 WL 4092390, *11.

The court must now determine whether the plaintiffs lack standing to bring a claim under Title III of the ADA means that the court also lacks subject-matter jurisdiction over the plaintiffs' other federal claim under the Rehabilitation Act. Just because the plaintiffs' Title III ADA claim will be dismissed for lack of subject matter jurisdiction does not mean the court also lacks jurisdiction over the plaintiffs' Rehabilitation Act claim. *See* Phillips v. St. Mary's Medical Center, 2013 WL 1124372 (court dismissed plaintiffs' Title III claim for injunctive relief for lack of standing but permitted their claim under the Rehabilitation Act to proceed); Shaika, 2015 WL 4092390, *8. Therefore, "a plaintiff must demonstrate standing separately for each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. at 185, 120 S.Ct. at 706; *see also* City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (despite the fact that plaintiff had standing to seek damages, he lacked standing to seek injunctive relief). Thus, "standing is not dispensed in gross." Lewis v. Casey, 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

## B. **Claim Under Section 504 of the Rehabilitation Act**

In Count I of their amended complaint, plaintiffs raise a claim under §504 of the RA, (Doc. 40, at 13-14). Allied moves for summary judgment with respect to plaintiffs' RA claim arguing that the accommodations offered by the dePaul School were reasonable. The question also arises as to whether the plaintiffs have stated a claim for money damages with respect to their RA claim.

Section 504 of the RA, 29 U.S.C. §794(a), states, in relevant part:

No otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

To prevail on a claim under the RA, plaintiffs must show that M.B.: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." S.H. ex rel. Durrell v. Lower Merion School Dist., 729 F.3d 248, 260 (3d Cir. 2013) (citation omitted).

Thus, the RA prohibits discrimination on the basis of disability in federally funded programs. Blunt v. Lower Merion School Dist., 767 F.3d 247, 274-75 (3d Cir. 2014). "[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same." Blunt, 767 F.3d at 275 (quoting Ridley School Dist. v. M.R., 680 F.3d 260, 282-83 (3d Cir.

2012)). Claims under §504 of the RA and the ADA are interpreted consistently but §504 has an additional federal financial assistance component. Langston v. Milton S. Hershey Med. Center, 2016 WL 1404190, \*6 (M.D.Pa. April 11, 2016) (citation omitted).

However, the plaintiffs can recover money damages under the RA. *See* Hollinger, 2016 WL 3762987, \*12 ("[U]nlike the ADA, a plaintiff bringing a claim under the RA is permitted to seek monetary relief including compensatory damages.") (citing A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 804 (3d Cir. 2007)). In fact, the Third Circuit has held that the available remedies for a violation of §504 of the Rehabilitation Act "include compensatory damages, injunctive relief, and other forms of relief traditionally available under suits for breach of contract." A.W. v. Jersey City Pub. Sch., 486 F.3d at 804; *see also* Majocha v. Turner, 166 F.Supp.2d 316 (W.D.Pa. 2001); Shaika, 2015 WL 4092390, \*9. In their §504 RA claim, (Count I), the plaintiffs request compensatory damages. They do not request injunctive relief. (Doc. 40, at 14).

Specifically, in their RA claim, plaintiffs allege that "defendant is a recipient of federal funds for the purposes of Section 504...." Plaintiffs also allege that "[w]ith deliberate indifference to M.B.'s rights, Defendant has barred Buddy from attending dePaul School with M.B." (Id.). There is no dispute that M.B. has a disability, that she qualified to attend the dePaul

School and that the dePaul School is a place of public accommodation that receives federal funds. Nor is there any dispute that Buddy is a certified service dog.

Moreover, "a school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits...." Blunt, 767 F.3d at 274 (citations omitted). "However, §504 does not mandate 'substantial' changes to the school's programs, and courts 'should be mindful of the need to strike a balance between the rights of the student and [his or her] parents and the legitimate financial and administrative concerns of the [s]chool [d]istrict.'" Id. (citations omitted). "The requirements under Title II [of the ADA] to make 'reasonable modifications of policies, practices, and procedures,' and the requirement under Section 504 to make 'reasonable accommodations,' are, except with respect to causation, materially identical." Alboniga v. School Bd. of Broward County Fla.,87 F.Supp.3d 1319,1332 (S.D.Fla. 2015) (citation omitted).

The United States Attorney General was required under the ADA to promulgate regulations implementing Title II and III of the Act. Id. As such, the DOJ has issued regulations "which contain provisions relating to covered entities' obligations to make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability." Id. (citing 42 U.S.C. §§12134(a), 12186(b); 28 C.F.R.

23

§§35.130(b)(7), 36.302). One of the Title II regulations is that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7). Thus, "a public entity need not allow an individual to use his service animal if it would fundamentally alter the nature of the entity's service, program, or activity, or if it would pose a direct threat to the health or safety of others." Id. at 1336 (citing §§35.130(b)(7), 35.139).

In 2012, the Attorney General issued revised regulations which "contain certain provisions enforcing the ADA with respect to the use of service animals in public entities, such as public schools and other public facilities." Alboniga, 87 F.Supp.3d at 1332 (citing 28 C.F.R. §35.136). "The regulation provides that '[g]enerally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability.'" Id. (citing §35.136(a)). *See also* (Doc. 46-1). There are two exceptions under the regulation, to wit: "A public entity may ask an individual with a disability to remove a service animal from the premises if (1) The animal is out of control and the animal's handler does not take effective action to control it; or (2) The animal is not housebroken." §35.136(b). It is undisputed that neither of these two exceptions applied to Buddy. The regulation also provides that "[i]ndividuals with disabilities shall be permitted

24

to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go." §35.136(g).

This court agrees with the court in Alboniga,87 F.Supp.3d at 1333, that "the DOJ's regulations and interpretations thereof—which are entitled to significant deference [under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778 (1984)]—are a permissible construction of the ADA" and that "the Title II service animal regulatory provision is consistent with and a specific application of the reasonable modifications regulatory requirement." Thus, the regulations are enforceable against Allied in deciding whether it violated federal law. *See* id. at 1337 ("[T]he DOJ's regulations implementing Title II of the ADA regarding the use by a disabled person of a service animal in a public entity, and the accommodation that entity must make to permit such use, are valid, internally consistent, and therefore enforceable against the School Board []."). Deference is also afforded to the DOJ in deciding whether the regulations are a permissible construction of §504 of the RA. Alboniga, 87 F.Supp.3d at 1334 (citing Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1179-79 (11th Cir. 2003)); *see also* Olmstead v. L.C. ex rel. Zimring, 577 U.S. 581, 591, 119 S.Ct. 2176 (1999).

To prove a violation under §504 "[t]he plaintiff must also demonstrate that the defendant knew or should have reasonably been expected to know

25

of her disability. However, to establish liability [as opposed to damages], a plaintiff need not prove that defendant['s] discrimination was intentional." Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 827 F. Supp. 2d 409, 417 (E.D. Pa. 2011) reconsideration denied, 2012 WL 3279243 (E.D. Pa. Aug. 13, 2012) (internal citations omitted); Durrell, 729 F.3d at 262. Additionally, "a plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and RA." Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa., 483 Fed.Appx. 759, 763 (3d Cir. 2012); Alboniga, 87 F.Supp.3d at 1337. "To make out such a claim, a plaintiff must show that the accommodation he seeks is reasonable, ..., i.e., that it is "necessary to avoid discrimination on the basis of disability." Muhammad, 483 Fed.Appx. at 763 (internal citation omitted) (quoting 28 C.F.R. §35.130(b)(7)). Plaintiff has the "initial burden of demonstrating that his requested accommodations were reasonable, i.e., necessary to permit his meaningful participation; upon making such a showing, the burden shifted to the defendants to demonstrate that the requested accommodations were unreasonable." Id. (citations omitted).

The parties do not contest the elements of a §504 claim. Allied argues that plaintiffs are not entitled to compensatory damages because they cannot prove intentional discrimination. No doubt, a plaintiff must demonstrate a showing of intentional discrimination or deliberate indifference as a prerequisite for an award of compensatory damages under §504 of the RA.

Durrell, 729 F.3d at 261 ("claims for compensatory damages under §504 of the RA [] also require a finding of intentional discrimination."). In D.E. v. Central Dauphin School Dist., 765 F.3d 260, 269 (3d Cir. 2014), the Third Circuit held that where a plaintiff seeks compensatory damages as a remedy for violations of the RA, "it is not enough to demonstrate only that the plaintiff has made out the prima facie case [of disability discrimination]" and that "[h]e or she must also demonstrate that the discrimination was intentional." (citation omitted). Further, "[a] showing of deliberate indifference satisfies that standard." Id. (citation omitted). *See also* Durrell, 729 F.3d at 263 (Third Circuit held that "a showing of deliberate indifference may satisfy a claim for compensatory damages under §504 of the RA []."); Blunt, 767 F.3d at 272 ("plaintiffs bringing claims under the ADA and RA may establish intentional discrimination with a showing of deliberate indifference.") (citation omitted); Shaika, 2015 WL 4092390, *9. Thus, since plaintiffs only seek compensatory damages, to prevent summary judgment they must demonstrate that there exists a genuine issue of material fact regarding whether Allied intentionally discriminated against M.B. or acted with deliberate indifference towards M.B.

The Third Circuit Court in D.E., 765 F.3d at 269, stated:

To satisfy the deliberate indifference standard, a plaintiff "must present evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated ..., and (2) failure to act despite that knowledge." Id. at 265 (citing Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)). "Deliberate indifference does not require a showing of personal ill will or

animosity toward the disabled person." Id. at 263 (quoting Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011) (internal quotation marks omitted)). It does, however, require a "'deliberate choice, rather than negligence or bureaucratic inaction.'" Id. (quoting Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 276 (2d Cir. 2009)).

The evidence shows that Allied knew or should have reasonably been expected to know of M.B.'s disability and that Buddy was medically necessary to be with M.B. There is also evidence that Allied had knowledge that M.B.'s federally protected right to use her service dog was substantially likely to be violated by not allowing her to attend the school with Buddy. Further, there is evidence that Allied failed to act despite this knowledge. According to plaintiffs, "it is undisputed that over two years Allied summarily denied M.B. the use of [Buddy] in school no less than eight times (February 2012, before 2012-13 school year, before 2013-14 school year, October 25, 28, 29, 2013, November 20, 2013 and November 27, 2013)." (Doc. 46, at 22). Further, plaintiffs advised the dePaul School the reasons M.B. needed Buddy and the tasks Buddy was trained to perform beginning when M.B. was first paired with Buddy. In fact, well before Dr. Sauter's November 2013 letter stating that it was medically necessary for Buddy to be with M.B. at all times, plaintiffs had advised the school of this necessity many times and Rickard did not doubt the veracity of this information.

The court finds that the evidence creates genuine factual disputes as to Allied's knowledge and failure to act, i.e., whether Allied was deliberately

indifferent toward M.B. by not allowing her to attend the school with Buddy. The court also finds that plaintiffs have presented sufficient facts to show that M.B. was excluded from participating in educational services at the dePaul School based on her disability by not timely allowing her to attend school with Buddy, which was a reasonable accommodation. While Allied has presented evidence that the requested accommodation, i.e., allowing Buddy to attend school with M.B. without the t-shirt was unreasonable, the plaintiffs have disputed this evidence by showing that Buddy could not perform properly wearing the t-shirt and that the other precautions taken to prevent M.H. from having an allergic reaction were sufficient.[5]

Moreover, Allied has not established that permitting M.B. to use Buddy at school would have fundamentally altered the nature of the services provided by the dePaul School as required by 28 C.F.R. 36.302(a). In fact, there is no evidence that when M.B. attended the school with Buddy from

---

[5]The court recognizes that "[a] failure-to-accommodate claim differs from other ADA claims in that the ADA does not require a failure-to-accommodate plaintiff to show that his injury was the result of purposeful discrimination." Muhammad, 483 Fed.Appx. at 764 (citation omitted). Rather, in a failure-to-accommodate case, "the plaintiff must demonstrate that, but for the failure to accommodate, he would not be deprived of the benefit he seeks." Id. (citation omitted). The court also notes that where the plaintiff's claims are based on a failure to make reasonable accommodations for a disabled person, Title II of the ADA and §504 of the RA work in the same manner. See Albongia, 87 F.Supp.3d at 1332 (citations omitted). However, in order to recover compensatory damages under the RA, plaintiffs must demonstrate that Allied intentionally discriminated against M.B. or acted with deliberate indifference toward her.

January 2, 2014 through January 16, 2014 the service dog fundamentally altered the services the school provided. While Allied argues that it did provide a reasonable accommodation to M.B. by allowing Buddy in the school if he wore a dander control t-shirt and that plaintiffs' own expert (Bennett) testified that Buddy could have been re-trained in about one week to perform wearing a t-shirt, plaintiffs point out that they proposed the t-shirt in early December 2013 after Allied repeatedly refused to permit M.B. to attend school with Buddy. The evidence is disputed as to whether the t-shirt hindered Buddy's ability to perform his trained service tasks. Plaintiffs have presented evidence showing that Buddy was unable to assist M.B. with his trained services wearing the t-shirt and this caused M.B. to suffer both physically and emotionally. Despite the undisputed subsequent evidence that Buddy could have easily been re-trained to perform his tasks for M.B. wearing a t-shirt, neither plaintiffs nor Allied ever inquired during the relevant time as to whether such re-training was possible. Both parties point fingers at each other as to whose responsibility it should have been to make the inquiry but this does not change the fact that when plaintiffs contacted New Hope, Castro only responded that Buddy should stick to how he was trained, i.e., without a t-shirt. Castro did not suggest re-training or even mention it as an option.

Allied also fails to establish an affirmative defense of "direct threat." To

prove this affirmative defense, there must be facts establishing a significant risk to the health or safety of others that cannot be eliminated or reduced to an acceptable level by modifications of policies, practices or procedures. See Doe, 242 F.3d at 447. Simply because M.H. was allergic to dogs is not sufficient to sustain this defense. Indeed, M.H. was willing to begin medical treatment for his allergies and did so. M.H.'s doctor suggested allergy shots and medications as well as a change in his home room from the room in which M.B. had her classes. Allied then made this change in the rooms. M.B. and M.H. were not in the same grade and after the change in M.H.'s home room, they did not share the same classrooms during the day. Moreover, other than the incident with M.H. having an allergic reaction when Buddy was in the school gym with M.B. for the bingo event, there is no evidence that M.H. became ill when M.B. actually attended the school with Buddy. Nor is there evidence to show that M.H. suffered adverse reactions caused by the allergy medications, and Allied's speculation that he did does not suffice.

Finally, plaintiffs have presented sufficient evidence to show with reasonable certainty that M.B. suffered damages as a result of Allied's failure to allow Buddy attend school with her. Cook testified that M.B. experienced exacerbated feelings of alienation and anxiety by not having Buddy in school with her. Plaintiffs will also testify regarding the anxiety and emotional distress

M.B. experienced. Thus, there is evidence that M.B. suffered mental anguish and anxiety caused by Allied's treatment of her.

As such, Allied's motion for summary judgment with respect to plaintiffs' RA claim will be denied.

### C. **Breach of Contract Claim**

Allied seeks summary judgment on plaintiffs' breach of contract claim raised in Count III of the amended complaint. Allied contends that even if an implied contract is found to exist, it is still entitled to summary judgment on plaintiffs' contract claim since plaintiffs failed to show that the dePaul School did not provide appropriate accommodations to M.B. during her attendance at the school.

"Under Pennsylvania law, the relationship between a private university and a student is contractual, the contract being 'comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of his or her enrollment in the institution.'" David v. Neumann Univ., –F.Supp.3d–, 2016 WL 3213353, *2 (E.D.Pa. May 10, 2016) (citing Swartley v. Hoffner, 734 A.2d 915, 919 (Pa.Super.Ct. 1999)). However, "the allegations must relate to a specific and identifiable promise that the school failed to honor." Id. (quoting Vurimindi v. Fuqua Sch. of Bus., 435 Fed.Appx. 129, 133 (3d Cir. 2011)). The student must specifically identify promises made in the school handbook that were

allegedly violated to establish a breach of contract claim. Id. (citations omitted).

Plaintiffs rely upon the 2013-2014 Allied Services dePaul School Parent/Student Handbook. The handbook states that "the dePaul School [provides] service to children with learning differences." Specifically, the plaintiffs' rely on the handbook's "Non Discrimination/Harassment Policy" which provides that the school "welcomes persons of all races, colors, national or ethnic origins and religions, both male and female to be full participants in the life of the school." The policy also states that "[i]f, with reasonable accommodation, the individual can meet the educational demands of the school program, he/she will be accepted." (Doc. 47-1 at 13). The handbook also provided a general "commitment against discrimination."

The school's anti-discrimination policy alone is insufficient to constitute an enforceable contract per se between the school and M.B. since, "like all other contracts, the terms of the agreement must be "sufficiently definite to be enforced." David, 2016 WL 3213353, *4 (citations omitted). The first sentence of the school's policy is clearly not definite enough to be enforced. Additionally, the court finds that the second sentence of the policy is not adequate to create a definite term to be enforced since it is a general statement of what the law requires. See id. (citing Nungesser v. Columbia Univ., —— F.Supp.3d ——, ——, 2016 WL 1049024, at *9 (S.D.N.Y. Mar. 11, 2016) (explaining that "a general statement of a university's adherence to

existing anti-discrimination laws does not create a separate and independent contractual obligation.")). The court in David, 2016 WL 3213353, *4, also relied upon Vurimindi, 435 Fed.Appx. at 132, and stated in that case, "[t]he plaintiff cited the university's mission, diversity, and anti-harassment policy statements as the basis for his purported contract with the university" and "[t]he Third Circuit held that the plaintiff could not base his breach of contract claim on these policy statements."

Similar to *David* and *Vurimindi*, the court finds that plaintiffs fail to state a breach of contract claim based on the dePaul School's Handbook general anti-harassment and anti-discrimination policy since they have failed to show how the "general aspirational policy statement created any sort of affirmative, enforceable duty on the part of the [school]." David, 2016 WL 3213353, *4 (citations omitted); *see also* Hart v. Univ. of Scranton, 2012 WL 1057383, at *3 (M.D.Pa. Mar. 28, 2012). As such, Allied's motion for summary judgment regarding plaintiffs' breach of contract claim will be granted.

### D. Negligence Claim

Allied moves for summary judgment on plaintiffs' negligence claim, Count IV. In their negligence claim, the plaintiffs aver: "80. Defendant owed M.B. a duty to accommodate her disabilities. 81. Defendant has breached this duty. 82. Plaintiffs have suffered harm as a result of Defendant's negligence." (Doc. 40 at 17). There is sufficient evidence in the record, which is detailed

above, that Allied owed a duty to abide by §504 of the RA, that Allied breached its duty by failing to permit M.B. to use Buddy at school, that Allied denied M.B. her federally protected right to attend school with her service dog, and that Allied's actions caused M.B. harm. In short, the affirmative duty Allied owed to M.B. under the RA and plaintiffs' evidence, which is disputed by Allied, sufficiently shows Allied violated its obligations not to discriminate against M.B.

Allied's expert, Corey Andres, who opines that Allied acted reasonably since it adhered to the requirements of the ADA, does not alter the court's finding regarding plaintiffs' negligence claim. In fact, as plaintiffs state, an expert may not provide legal opinions since that it is the duty of the court to decide. The law is settled that experts can provide an opinion about the ultimate issue in a case, but may not give an opinion tied to any legal conclusion, such as whether a defendant was negligent. Patrick v. Moorman, 536 Fed. App'x 255, 258 (3d Cir. 2013)(citing Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006); United States v. Leo, 941 F.2d 181, 196–97 (3d Cir. 1991)). Andres can render an opinion as to how Allied's conduct met with the requirements of the ADA and RA, but he cannot give an opinion as to whether Allied violated these statutes or was negligent. As discussed, the court has found the evidence to be disputed as to whether Allied complied with the requirements of the RA. Thus, Allied's motion for summary judgment regarding plaintiffs' negligence claim will be denied.

35

### E. **IIED Claim**

Allied also moves for summary judgment on plaintiffs' IIED claim, Count V. In their IIED claim, the plaintiffs allege: "84. Defendant's conduct, including barring M.B. from school with her service dog, Buddy, is extreme and outrageous and intentionally or recklessly caused severe emotional distress to M.B. and M.B.'s parents. 85. As a result of Defendant's extreme and outrageous conduct, M.B. and M.B.'s parents have suffered physical injury or harm." (Doc. 40 at 18).

To date, the Pennsylvania Supreme Court has not yet recognized a cause of action for IIED. Bamont v. Pa. Soc. for the Prevention of Cruelty to Animals, 163 F.Supp.3d 138, 155 (E.D.Pa. 2016). Other courts in Pennsylvania have recognized an IIED claim and have indicated that to state such a claim, a plaintiff must allege extreme and outrageous conduct which intentionally or recklessly causes him severe emotional distress. Id. (citations omitted); Reedy v. Evanson, 615 F.3d 197, 231-32 (3d Cir. 2010). Thus, to state an IIED claim "Defendants' conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Hines v. Proper, 442 F. Supp. 2d 216, 224 (M.D. Pa. 2006) (citing Restatement Second of Torts §46, comment (d)(1965); Wilson v. American General Finance Inc., 807 F.Supp.2d at 303. Liability for an IIED claim is reserved "for only the most clearly desperate and ultra extreme

36

conduct." Hoy v. Angelone, 554 Pa. 134, 720 A.2d 745, 754 (1998). "In addition, Pennsylvania requires that competent medical evidence support a claim of alleged intentional infliction of emotional distress." Hines v. Proper, 442 F. Supp. 2d at 224 (citation omitted). "Finally, Pennsylvania law requires some type of physical harm due to the Defendant's outrageous conduct to satisfy the severe emotional distress element." DiLoreto v. Costigan, 600 F.Supp.2d 671, 691 (E.D. Pa. 2009) (citations omitted); Wilson v. American General Finance Inc., 807 F.Supp.2d at 303 ("A resulting physical harm must also be alleged.") (citation omitted).

In October 2013, when plaintiffs again asked for permission for M.B. to use her service dog at school and explained that because M.B. was being weaned off of the ketogenic diet she had been on for years, her doctor expected her seizure activity to increase. Plaintiffs also told Allied that M.B. was very frightened about having to attend school without Buddy. Rickard promised to look into it and to get back to plaintiffs, but she did not do so for more than a month. In addition to being afraid to attend dePaul School without Buddy and getting sick in the morning prior to school, M.B. had an increase in night tremors and seizure activity when she attended the school with Buddy wearing a t-shirt since it was not trained with one and it interfered with his ability to alert when M.B. was going to have a seizure. Additionally, Cook's testimony, detailed above, provides competent medical evidence with respect to the IIED claim brought on behalf of M.B. (Doc. 47-3, Doc. 47-23).

While it is a close call as to whether the evidence, viewed in a light most favorable to plaintiffs, is sufficient to support their IIED claim raised on behalf of M.B., the court finds that Allied's conduct toward M.B. was not so extreme and outrageous that a jury could reasonably find it constituted the "most clearly desperate and ultra extreme conduct" required to support an IIED claim. Allied's conduct in requiring Buddy to wear a dander control t-shirt could reasonably be construed as trying to ensure that the dePaul School provided a safe environment for all of its students, including M.H. who had severe dog allergies. This conduct simply does not rise to the level of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."

Additionally, as this court previously held in denying Allied's motion to dismiss, the adult plaintiffs were not basing their IIED claim upon alleged damages suffered by M.B. However, at this post-discovery stage of the case, the court finds that there is insufficient evidence to show that the adult plaintiffs themselves suffered some type of physical harm due to Allied's conduct. Nor do adult plaintiffs point to any competent medical evidence to support the IIED claim brought on their behalf.

Thus, the court will grant Allied's summary judgment motion with respect to Count V of the plaintiffs' amended complaint, *i.e.*, the IIED claim.

## V.      CONCLUSION

For the foregoing reasons, Allied's motion for summary judgment, (Doc.

43), will be **GRANTED IN PART AND DENIED IN PART**. The motion will be

granted with respect to plaintiffs' ADA and PHRA claims, breach of contract

claim, and the IIED claim. The motion will be denied with respect to plaintiffs'

RA claim and their remaining state law claims, i.e., negligence claim and IIED

claim as to M.B. A separate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Dated: September 30, 2016**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-0691-02.wpd

39